# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

PATRICIA C. GALANIS,

        Plaintiff,

    v.                                    Case No. 06-C-1132

N.C. CARO, M.D., S.C. DEFINED BENEFIT
PLAN, and NICHOLAS C. CARO,
its Administrator,

        Defendants.

---

## DECISION AND ORDER

---

### I. PROCEDURAL BACKGROUND

The plaintiff, Patricia C. Galanis ("Galanis"), commenced this action on October 31, 2006, by filing a complaint naming N.C. Caro, M.D, S.C. Defined Benefit Plan (the "Plan"), and Nicholas C. Caro ("Caro") as defendants. The complaint sought information and benefits allegedly owed by the defendants to the plaintiff. On May 25, 2007, Galanis filed a Rule 7.4 Expedited Non-Dispositive Motion seeking leave to file an amended complaint which sought to add a claim of fiduciary breach in the management of fund assets. The motion to amend the complaint was granted on August 6, 2007. The amended complaint asserts three claims: (1) wrongful denial of benefits under ERISA § 502(a)(1)(B); (2) failure to provide information under ERISA § 502(c)(1); and (3) breach of fiduciary duty in the management of fund assets under ERISA §§ 404(a)(1)(A), (B), and 406(a), (b).

The court has jurisdiction over this action pursuant to ERISA § 502(e)(1), codified at 29 U.S.C. § 1132(e)(1). Venue is proper in this district under ERISA § 502(e)(2), codified at 29 U.S.C. § 1132(e)(2). Currently pending before the court is the plaintiff's motion for summary judgment, which is now fully briefed and is ready for resolution. For the reasons which follow, the plaintiff's motion for summary judgment will be granted in part and denied in part.

## II. FACTUAL BACKGROUND

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the plaintiff's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the defendants' response to the motion for summary judgment was accompanied by a set of proposed findings of fact. Both the plaintiff and the defendants also filed responses to the proposed findings of fact set forth by the opposing party. A review of the parties' respective proposed findings and the responses thereto reveal that the following are the material and (except where noted) undisputed facts that are relevant to the disposition of the motion for summary judgment. These include material facts over which the court concludes there to be no genuine dispute, such as the actual text of documents (although the parties may not be willing to admit such to be the case).

Galanis was an employee of N.C. Caro, M.D., S.C. (the "Practice") and is a "participant" in the N.C. Caro, M.D, S.C. Defined Benefit Plan (the "Plan"). Galanis was born on October 18, 1946, and was over 55 years old when her employment with the Practice was terminated in April 2005. She had been an employee of the Practice since January 26, 1996. (Plaintiff's Proposed Findings of Fact ("PPFOF") ¶ 1.)

The Plan is an employee benefit plan of the Practice, and both the Plan and the Practice are located in Chicago, Illinois. (PPFOF ¶ 2.) Caro is the president and sole shareholder of the Practice.

2

(Defendants' Proposed Findings of Fact ("DPFOF") ¶ 1.)  The Practice sponsored and created the

Plan effective January 1, 1999 (DPFOF ¶ 6.)  The Plan was amended and restated on May 9, 2007,

effective as of January 1, 2007.[1]  (DPFOF ¶ 7; hereinafter referred to as the "Amended Plan.")  The

Plan was frozen as of December 31, 2001.  (DPFOF ¶ 8.)

The Plan's 5500 forms list the Practice as the Plan's sponsor.  (DPFOF ¶ 10.)  The Plan states

that "The Sponsoring Employer is the named fiduciary, administrator of the Plan, and agent to

receive service of legal process and, except as otherwise provided herein, shall have the authority to

control and manage the operation and administration of the Plan."  (DPFOF ¶ 10; Levy Aff., Ex. I,

Art. XIII(B).)

Under the Plan, the Normal Retirement Age is the later of the "(i) first day of the month

coinciding with or immediately following the Participant's 55th birthday; and (iii) the 5th anniversary

of the Participant's commencement of participation under the Plan."  (Defendant's Response to

PPFOF ¶ 6; Levy Aff., Ex. I, Art. I(H).)  Moreover, under the Plan "[t]he Committee shall direct the

Trustee to distribute to a Participant the amount of his or her vested Accrued Benefit as a result of

the Participant's (i) termination of employment for any reason other than death."  (Defendant's

Response to PPFOF ¶ 6; Levy Aff., Ex. I, Art. VII(B).)

On September 27, 2005, the plaintiff sent a letter to Caro which stated: "As you know, my

benefits under the N. C. Caro, M.D., S.C. Defined Benefit Plan are fully vested.  Since I was

terminated on April 29, 2005, I should have received my vested benefits by this date.  Please look

---

[1]The plaintiff objects to the reference or reliance on amendments to the Plan enacted in May
2007 because these were enacted after the initiation of the case at bar.

3

into this matter and send me my vested benefits by October 21, 2005." (PPFOF ¶ 8; Levy Aff., Ex. XVI, Response 10.)

On February 21, 2006, the plaintiff sent a letter to Caro which stated "I will hold you as the administrator of the Defined Benefit Plan liable for distribution earned and effective as of April 29, 2005 and expect to receive payment by March 1, 2006. Documents for the transfer of funds should have already been prepared and sent to me." (PPFOF ¶ 8; Levy Aff., Ex. XVI, Response 10.)

No payments were made to the plaintiff by the Plan, and she received no written responses to the letters. (PPFOF ¶ 8.) The plaintiff wrote a letter to the Department of Labor ("DOL") on November 19, 2005 concerning her right to receive her benefits. The DOL responded with a letter on December 20, 2005, which noted that Lisa Stromek of the DOL had spoken with Caro on December 14, 2005, and that Stromek had also contacted the plaintiff sometime afterwards to discuss benefit payment options, ERISA appeals procedures, and ERISA civil penalties for failures to respond to information requests. (Defendant's Response to PPFOF ¶ 8; Caro Aff., Ex. I.)

On May 5, 2006, the plaintiff, by her attorney, made a formal written request and claim for her benefits. (PPFOF ¶ 9; Levy Aff., Ex. XII, Ex. C) The letter outlines why the plaintiff is entitled to benefits, and states that "Ms. Galanis hereby requests that the present value of her vested Accrued Benefit be distributed to her as soon as administratively feasible . . . Ms. Galanis requests that a full and fair response to this final request be issued to her within the next thirty (30) days. Absent a meaningful response, she will thereafter consider authorizing the pursuit of statutory remedies available to her." (Levy Aff., Ex. XII, Ex. C.)

On June 8, 2006, the Plan, by its attorney, wrote a letter to the plaintiff's attorney, stating that "The Plan Sponsor has advised us that it anticipates seeking a new determination letter from the IRS

4

in line with the guidelines under IRS Revenue Procedure 2005-66. Following the receipt of the determination letter, the Plan will then distribute the vested accrued benefits to former Plan participants, including Ms. Galanis." (PPFOF ¶ 10; Defendant's Response to PPFOF ¶ 10; Levy Aff., Ex. XII, Ex. C.)

On June 20, 2006, the Plan's attorney confirmed that "the June 8 letter does constitute the Plan Administrator's complete response to your May 5, 2006 claim letter on behalf of Ms. Galanis in compliance with Labor Regulation section 2560.503-1(g)." (PPFOF ¶ 11; Defendant's Response to PPFOF ¶ 11; Levy Aff., Ex. XII, Ex. C.)

On July 21, 2006, the plaintiff, by counsel, wrote a letter stating that "this letter constitutes Ms. Galanis' final appeal of the denial of her claim for benefits to the Administrative Committee acting as the delegated Plan Administrator for the Sponsoring Employer." (PPFOF ¶ 12; Defendant's Response to PPFOF ¶ 12; Levy Aff., Ex. XII, Ex. C.)

On August 25, 2006, the Plan's attorney denied the plaintiff's appeal, stating that "[w]ith respect to your appeal, Dr. Caro has advised me to communicate to you that the U.S. Department of Labor in Chicago agreed that a favorable IRS ruling was required to protect the Plan participants. Therefore, Dr. Caro, acting on behalf of the Plan sponsor, and the U.S. Department of Labor have made an agreement that this would be the course of action. Per this agreement, the appeal of the claim is denied." There was no formal, written agreement that existed with the DOL.[2] (PPFOF ¶ 13; Defendant's Response to PPFOF ¶ 13; Levy Aff., Ex. XII, Ex. C.)

_____

[2]The defendants contend that there was an oral agreement with the DOL via Lisa Stromek. (Defendant's Response to PPFOF ¶ 13.)

5

On September 11, 2006, the plaintiff, by counsel, requested that the Plan either provide a copy of the notice of plan termination or have its administrator confirm in writing that no termination proceedings have been initiated. Moreover, the letter requested that the Plan, "[i]n the event a termination proceeding in underway, please provide copies of all documentation indicating when it began, what its status is, what is being done to protect the interests of the participants, and what impact, if any, it will have on Ms. Galanis and her accrued, vested benefits." (PPFOF ¶ 13; Defendant's Response to PPFOF ¶ 13; Levy Aff., Ex. XVIIIA.) On September 25, 2006, the plaintiff, by counsel, requested that the Plan provide the plaintiff with information asked for in the September 11, 2006 letter, and requested the immediate payment of benefits. (PPFOF ¶ 13; Defendant's Response to PPFOF ¶ 13; Levy Aff., Ex. XIXA.)

The defendant's letter of September 19, 2006, in response to the September 11, 2006 letter from the plaintiff, stated that "if [plaintiff] has not forwarded all correspondence between both counsels to you, please contact us at your convenience and we will provide you with the information/documents you need." (PPFOF ¶ 14; Defendant's Response to PPFOF ¶ 13; Levy Aff., Ex. XVIIIB.) The defendant's letter of September 28, 2006, in response to the September 25, 2006 letter from the plaintiff, notified the plaintiff of the resignation of actuary Joan Gucciardi (Gucciardi), and stated that "[a]t this time, no payments can be made to Mrs. Galanis. All actuarial studies will have to be re calculated by the new actuary before any participants can be paid." (PPFOF ¶ 14; Defendant's Response to PPFOF ¶ 14; Levy Aff., Ex. XIXB.)

The Plan has not filed any request for plan termination. The Plan did file a request for a determination letter on May 9, 2007. The Plan has not paid any benefits to the plaintiff. (PPFOF ¶

6

15.) The May 9, 2007 request for an IRS determination letter is pending. The IRS asked for additional information on September 17, 2007. (DPFOF ¶ 33.)

The Plan had funding deficits in 2004 and 2005.[3] In July 2003, the Practice contributed 800 shares of Clear Sight, Inc., valued at $144,000, to the Plan to satisfy previous Plan underfunding. (DPFOF ¶ 17.) This transaction was a prohibited transaction. (DPFOF ¶ 18.) The defendants contend that the illegal stock transfer was corrected by Caro personally paying $144,000, the value of the stock, to the Plan on February 17, 2006. (DPFOF ¶ 23.) Caro also contends that he simultaneously made a $34,528 payment to the Plan to correct its underfunding. (DPFOF ¶ 24.) The plaintiff disputes whether these checks were actually deposited. (PPFOF ¶ 19.)

Caro also wrote two checks, totaling $178,528.00, on May 18, 2006. (DPFOF ¶ 26.) These checks were not deposits into the Plan account, but were checks, drawn on the Plan account, to be invested in American Funds. (DPFOF ¶ 27.)

Actuary Gucciardi recommended that the Plan seek a favorable determination from the IRS because of the difficulties caused by the illegal stock transfer and the need to unwind the transfer. Caro was also informed that new calculations would have to be made as to all participants' benefits. (DPFOF ¶ 28.) Gucciardi testified in her February 28, 2007 deposition that "If benefits are distributed before a favorable letter is received from the IRS, there is a risk that such benefits would be immediately taxable." (DPFOF ¶ 29.)

---

[3]The plaintiff also asserts that the Plan was underfunded in 2002. The defendant denies this assertion, and points to an amended Form 5500 for the year 2002. (Defendant's Response to PPFOF ¶ 16; Caro Aff., Ex. R.) The defendant asserts that the funding deficit in 2004 was $34,528, and in 2005 was $19,516. (Defendant's Response to PPFOF ¶ 16; Caro Aff., Ex. R.)

7

The parties contest whether there was an oral agreement with the DOL that no distribution to the plaintiff should be made until the stock transfer was corrected and a positive IRS determination letter was obtained. The defendant, Caro, contends that he was contacted on or about December 14, 2005 by Lisa Stromek of the DOL, and that Caro spoke with Ms. Stromek about the illegal stock transfer, its anticipated correction, and the difficulties the transfer had caused the Plan. (DPFOF ¶ 35.) According to Caro, during subsequent conversations, Ms. Stromek agreed that obtaining a positive IRS determination letter before making a distribution was the proper course of action. Caro contends that Ms. Stromek, on behalf of the Department of Labor, orally agreed that no distribution to the plaintiff should be made until the stock transfer was corrected and a positive IRS determination letter was obtained. (DPFOF ¶ 36.)

A decision was made to terminate the Plan in early 2006. (DPFOF ¶ 39.) That decision has not been implemented. (DPFOF ¶ 40.) Termination would not be effective until after a favorable IRS determination letter and the distribution of the Plan's assets. (DPFOF ¶ 41.)

Gucciardi testified in her deposition that there are three alternatives "when a Plan is terminated and there are insufficient assets to satisfy the benefits." (DPFOF ¶ 42; Gucciardi Dep. at 33.) The three alternatives listed by Gucciardi are: (1) "have the company contribute sufficient amount of dollars to bring the plan assets in line with the present value of the accrued benefits"; (2) have "the majority owner of the firm, in this case Dr. Caro, [] essentially take a haircut[4] to insure that all the participants receive their entire vested benefits"; and (3) "provide a pro rata allocation of assets . . . have every participant share in the deficiency." (DPFOF ¶ 42; Gucciardi Dep. at 33-35.)

_____

[4]The phrase "take a haircut" refers to Caro waiving his entitlement to some of his own benefits to the extent needed to pay the other Plan participants.

8

Gucciardi agreed in her deposition that "the first discussion of the three alternatives []  preceded [the plaintiff's] request for payment." (DPFOF ¶ 43; Gucciardi Dep. at 83.) Gucciardi further testified that attorney Larry Davidson was "leaning toward the first two" alternatives, but that he did not rule out the option of pro rata allocation. (DPFOF ¶ 44; Gucciardi Dep. at 72.) Gucciardi also stated that Caro wanted to pursue the pro rata allocation option. (DPFOF ¶ 35; Gucciardi Dep. at 35.) Gucciardi testified that she resigned on September 1, 2006 because "there was no resolution forthcoming . . . Larry Davidson . . . had been fired at that point, and I didn't see any resolution forthcoming relative to the status of the termination and distribution of assets." (DPFOF ¶ 50; Gucciardi Dep. at 72.)

Actuary Gucciardi permanently terminated her services for the Plan on September 1, 2006. (DPFOF ¶ 49.) The parties dispute whether attorney Davidson also quit around the same time.[5] Caro contends that he directed Gucciardi to file for an IRS determination letter on February 23, 2006, and points to a letter from Caro to Gucciardi dated February 23, 2006, in which he requests that she "file for an Internal Revenue Service favorable ruling so that all participants of the plan can role [sic] over their funds into an IRA without taxable consequences." (DPFOF ¶ 52; Levy Aff. Ex. V.) Caro contends that this request crossed in the mail with Gucciardi's February 2006 resignation letter.[6] (DPFOF ¶ 53; Levy Aff. Ex. VIII.)

---

[5]The defendants contend that attorney Davidson quit around September 2006, but the plaintiff argues that Davidson was still the Fund's attorney as of November 30, 2006. (DPFOF ¶ 54; Plaintiff's Response to DPFOF ¶ 54.)

[6]Gucciardi resigned three times before permanently terminating her employment on September 1, 2006 (Gucciardi Dep. at 71-72.)

9

As of September 2006, the Plan had no actuary, no determination letter application, and no IRS response. (DPFOF ¶ 55.) The Plan hired another actuary, Terry Ronczkowski, in February 2007. (DPFOF ¶ 58.) Actuary Ronczkowski prepared an application for a favorable IRS determination, and this application was filed on or about May 9, 2007. (DPFOF ¶ 60.)

Gucciardi testified that she had calculated the plaintiff's benefits as of December 31, 2005, and that her lump sum retirement benefit was $74,838. (PPFOF ¶ 17; Gucciardi Dep. at 26-27.) The Plan's accrued benefit liability for the Plan Year ending December 31, 2005 was $416,680.00 and its assets were $241,300.00. (PPFOF ¶ 17; Levy Aff., Ex. III.) The parties dispute whether there were funding deficiencies for the years 2006 and 2007 that would deprive each participant in the Plan from receiving a full benefit if the Plan terminated in 2006 or 2007. (PPFOF ¶ 18; Def.'s Resp. to PPFOF ¶ 18.)

The defendant revised his response to plaintiff's first interrogatories, and averred that "no withdrawals [from the Plan] occurred through 2006. . . Withdrawals occurred in January and February 2007 to pay [two attorneys and two actuaries a total of $30,272.60] . . . A loan of $49,727.40 was made to Nicholas Caro in 2007. " (PPFOF ¶ 20; Levy Aff., Ex. XI.) The parties dispute the impact these withdrawals had on the ratio of assets to accrued benefits. (PPFOF ¶ 20; Def.'s Resp. to PPFOF ¶ 20.)

The parties dispute whether Caro took a "loan" of approximately $70,000 on April 27, 2006. The defendants contend that this was not a loan, but rather a distribution. The defendants argue that Caro mistakenly thought this was a loan, but that the Plan's actuary informed him that this was not a loan but instead a taxable distribution. (PPFOF ¶ 21; Def.'s Resp. to PPFOF ¶ 21.)

10

### III. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "'[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion.'" *EEOC v. Sears, Roebuck & Co.*, 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

11

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson*, 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. Univ. of Wisconsin-Eau Claire*, 70 F.3d 469, 477 (7th Cir. 1995)). A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

### IV. DISCUSSION

#### A. Denial of Benefits

The initial question to resolve is the scope of review that this court is to employ in reviewing the administrator's decision to decline to pay the plaintiff her benefits. The defendants argue that the court should apply the arbitrary and capricious standard of review.

"In ERISA cases the scope of the district court's . . . review is governed by the rule that a denial of benefits is reviewed de novo unless the plan gives the plan administrator discretion to construe policy terms." *Hess v. Reg-Ellen Mach. Tool Corp.*, 423 F.3d 653, 658 (7th Cir. 2005)

Case 2:06-cv-01132-WEC   Filed 01/07/08   Page 12 of 47   Document 75

(citing *Ruttenberg v. U.S. Life Ins. Co.*, 413 F.3d 652, 659 (7th Cir. 2005). "If the plan grants an administrator such authority, that administrator's interpretation of contract terms is reviewed under an arbitrary and capricious standard." *Ruttenberg*, 413 F.3d at 659. "Under this 'least demanding form of judicial review,' . . . we will not set aside a denial of benefits based on any reasonable interpretation of the plan." *Hess*, 423 F.3d at 658 (quoting *Mers v. Marriott Int'l Group Accidental Death and Dismemberment Plan*, 144 F.3d 1014, 1021 (7th Cir.1998). "Indeed, whether or not we would have reached the same conclusion is irrelevant; we will overturn the fiduciary's denial of benefits only if it is 'completely unreasonable.'" *Id.* (citing *Ruiz v. Cont'l Cas. Co.*, 400 F.3d 986, 991 (7th Cir.2005).

The defendants argue that the Plan documents give the Plan and its administrator discretion to interpret the Plan, such that the administrator's interpretation of the Plan's terms should be reviewed under the arbitrary and capricious standard. Specifically, the defendants point to Article XIII(B) of the Plan, which describes the named fiduciary and Plan administration:

> The Sponsoring Employee is the named fiduciary, administrator of the Plan, and agent to receive legal process and, except as otherwise provided herein, shall have the authority to control and manage the operation and administration of the Plan. The Committee, as agent for the administrator and subject to the administrator's approval, shall make such rules, regulations, interpretations and computations and shall take such other action to administer the Plan as the Committee may deem appropriate in its sole discretion. The Committee shall administer the Plan in a non-discriminatory manner consistent with the requirements of Section 401(a) of the Code. The Committee shall resolve by majority vote all questions involving the interpretation, application and administration of the Plan. The Committee's resolution of such questions shall be final and binding upon the Participants, their Beneficiaries, and the successors, assigns, heirs and personal representatives of any of them.

(Levy Aff., Ex. I, Art. XIII(B), p. 100.)

13

In *Militello v. Central States, Southeast and Southwest Pension Fund*, 360 F.3d 681 (7th Cir. 2004), the court noted that previously, in *Herzberger v. Standard Ins. Co.*, 205 F.3d 327, 331 (7th Cir. 2000), the Seventh Circuit had designated the following phrase as safe harbor language that clearly gives the plan administrator broad discretionary power and thus ensures deferential review: "[b]enefits under this plan will be paid only if the plan administrator decides in his discretion that the applicant is entitled to them." *Id.* (quoting *Herzberger*, 205 F.3d at 331). However, the court was quick to add that "[w]hile this language ensures deferential review, that precise wording is not required." *Id.* This is because "'the courts have consistently held that there are no "magic words" determining the scope of judicial review of decisions to deny benefits.'" *Id.* (quoting *Herzberger*, 205 F.3d at 331).

It is my opinion that the standard of review to be employed by this court in reviewing the decision of the Plan administrator in this case is the arbitrary and capricious standard. To be sure, the Plan does not contain language identical to that in *Herzberger* stating that the Plan administrator has discretion in deciding whether the applicant is entitled to benefits. However, the Plan does state that the Committee, as an agent for the administrator, "shall make such rules, regulations, interpretations and computations and shall take such other action to administer the Plan as the Committee may deem appropriate in its sole discretion," and that "[t]he Committee shall resolve by majority vote all questions involving the interpretation, application and administration of the Plan." This language indicates that the Plan gives the administrator (via the Committee) discretion to interpret the Plan, at least in regard to the Plan's administration, such that the administrator's decisions regarding the Plan's administration are entitled to deferential review. *See Hess*, 423 F.3d at 658 (noting that the parties agreed that the plan in question gave the plan administrator discretion

14

to interpret the plan, given the provision stating that "[t]he Administrator . . . shall have the power and discretion to construe the terms of the Plan and to determine all questions arising in connection with the administration, interpretation, and application of the Plan.").

It is important to note that the primary issue in this case is not whether the plaintiff was eligible for benefits, as the defendants concede that the plaintiff was fully eligible for benefits upon her termination. Rather, at issue in this case is the proper timing of the payment of the plaintiff's benefits. The applicable provision in the Plan states that "[d]istributions of the present value of vested Accrued Benefits to Participants upon employment termination prior to Normal Retirement Date shall be made as soon as administratively feasible after employment termination date." (Levy Aff., Ex. I, Art. I, ¶ HH). Given the language in the Plan providing sole discretion to the Committee in taking actions to administer the Plan, as well as to interpret the Plan, a decision as to when payments are "administratively feasible" appears to be one such discretionary decision granted to the Committee.

Although the decision to deny payments at the time they were requested will be reviewed under the arbitrary and capricious standard, it is noteworthy that there may be a financial conflict of interest involved in that decision. The Seventh Circuit has held that when there is "evidence that the committee's decision to deny the [plaintiff's] claims may have been animated by concerns for [the defendant's] finances, [the court] may perform a slightly 'more penetrating' review." *Hess,* 423 F.3d at 660 (citing *Manny v. Central States, Southeast & Southwest Areas Pension & Health and Welfare Funds,* 388 F.3d 241, 242-43 (7th Cir. 2004) (arbitrary and capricious standard is "'a sliding scale' that requires that judicial review be 'more penetrating the greater is the suspicion of partiality, less penetrating the smaller that suspicion is.') (quoting *Van Boxel v. Journal Co. Employees' Pension*

15

*Trust*, 836 F.2d 1048, 1052-53 (7th Cir. 1998)).  There is greater concern of a conflict of interest "when the employer is the administrator of a self-funded single-employer plan."  *Manny*, 388 F.3d at 242.

In the case at hand, Caro, the administrator of a single-employer plan, is also the president and sole shareholder of the Practice.  Given the potential for a conflict of interest which arises from such circumstance, the court will perform a slightly more penetrating review of the decision to deny benefits.

The next question to address is whether the decision to defer payment of the plaintiff's benefits because it was not administratively feasible to pay such benefits was "completely unreasonable."  In reviewing the language of the Plan and the circumstances of the case, I conclude that the decision to delay payment of the plaintiff's benefits was not a reasonable interpretation of the Plan.

The plaintiff argues that she was entitled to full payment of her retirement benefit as of September 27, 2005.  Specifically, the plaintiff contends that she meets the eligibility criteria outlined by the Plan, and that the Plan had sufficient assets to pay her in full at any time in 2005 and 2006.  (Pl.'s Br. at 13.)  In response, the defendants concede that the plaintiff meets the eligibility criteria, and is entitled to benefits.  However, the defendants argue that, based on the advice of the Plan's actuary and counsel, and given the Plan's agreement with the Department of Labor, it was determined that it would not be administratively feasible to pay the plaintiff her full benefits until after the correction of the prohibited transfer and the receipt of a favorable IRS ruling.  (Def.'s Br. at 17-18.)

16

In support of her contention that the Plan had the assets and ability to pay her in full at the time she became eligible for benefits, the plaintiff points to the deposition testimony of the Plan's previous actuary, Joan Gucciardi:

> [Plaintiff's Counsel]: Do you know of anything about this Plan which would prevent it from paying a full lump sum benefit to Patricia Galanis in the . . . third or fourth quarter of 2005?
>
> [Actuary]: No

(Gucciardi Dep. at 23.)

The plaintiff also notes that Gucciardi testified that the Plan had sufficient assets to pay her in full at any time in 2005 and 2006, even if Caro sought termination of the plan:

> [Actuary]: The effective date of the Plan termination would be after a favorable determination letter was received from the IRS and the assets were distributed.
>
> [Plaintiff's Counsel]: So it was sometime later than February, 2006?
>
> [Actuary]: Yes.
>
> [Plaintiff's Counsel]: Okay. And for someone who left the Plan in 2005, would this reallocation issue be applicable?
>
> [Actuary]: Yes.
>
> . . .
>
> [Plaintiff's Counsel]: Let me go back a step. If a person had applied for a benefit and received it within sixty days of application during 2005, would they have been affected by this?
>
> [Actuary]: No.
>
> [Plaintiff's Counsel]: So the reason that Pat Galanis was subject to this contingency or this possibility was that no action had been taken on her application for benefits?
>
> [Actuary]: That's correct.

17

[Plaintiff's Counsel]: Okay. And do you know whether she had applied for benefits before this kind of termination was discussed?

[Actuary]: Yes, she had applied for benefits.

[Plaintiff's Counsel]: And did the Plan have the wherewithal to calculate and pay those benefits before this alternative for termination was discussed?

[Actuary]: Yes.

[Plaintiff's Counsel]: So by not paying her during 2005, she became susceptible to the circumstances you just described for Plan termination?

[Actuary]: Correct.

. . .

[Plaintiff's Counsel]: In any event is there any reason why the Plan could not pay the benefits you calculated for . . . Ms. Galanis in 2005 prior to receiving this determination letter?

[Actuary]: The only reason that I can think of where benefits couldn't be paid would be liquidity of the Plan assets.

[Plaintiff's Counsel]: And as of the end of 2005, the Plan had sufficient assets to pay that benefit?

[Actuary]: It had sufficient assets, but perhaps not sufficient liquidity.

. . .

[Plaintiff's Counsel]: Once the checks from the Doctor had been put into the Plan effectively buying the stock, the liquidity was present, was it not?

[Actuary]: That's correct.

[Plaintiff's Counsel]: And so whatever barrier there was in that regard had been eliminated as of the time the Doctor says he sent two checks, which is mentioned in his letter of February 23rd . . .

[Actuary]: Yes.

(Gucciardi Dep. at 35-37, 48.)

18

The plaintiff also cites to deposition testimony in which Gucciardi discusses the impact of the prohibited transaction on Galanis' ability to receive benefits. The actuary stated that whether or not the Plan was qualified, the plaintiff would still have been able to be paid her benefits in full.

> [Plaintiff's Counsel]: Now if the Plan was indeed not qualified as of February 23rd because of the prohibited transaction or for whatever other reason, does that mean that in 2005 when Ms. Galanis first asked for her benefit, her tax situation was exactly the same whether or not the Plan was qualified. That is, she was either going to pay taxes on it as income because it was not qualified or she was going to pay taxes on it as income because she took the money, the only distinction would be the rollover option?
>
> [Actuary]: That would be correct.
>
> [Plaintiff's Counsel]: And that would not prevent her from receiving her benefit, it would just go to how much she paid in taxes?
>
> [Actuary]: That's correct.

(Gucciardi Dep. at 43.)

In response, the defendants argue that the issue is not merely whether the Plan had the ability to pay the plaintiff her benefits, but rather whether the Plan should obtain a determination letter prior to paying them. The defendants also cite the testimony of actuary Gucciardi in support of their position:

> [Defense Counsel]: And then on Exhibit 8 you state, after having observed that there are participants asking for immediate distribution, your last sentence says, "If benefits are distributed before a favorable letter is received from the IRS, there is a risk that such benefits would be immediately taxable;" right?
>
> [Actuary]: Correct.
>
> [Defense Counsel]: And is this - - Are you saying in that letter that the more prudent approach would be to wait until the favorable letter is received from the IRS before making an immediate distribution of Plan benefits?
>
> [Actuary]: That's what I'm saying, yes.

19

(Gucciardi Dep. at 92-93.)

The defendants contend that whether the Plan acted reasonably in waiting to obtain a determination letter before distributing benefits, in light of the prohibited transaction, potential adverse consequences of the Plan, advice of its actuary, and agreement with the Department of Labor, are questions of fact. Moreover, the defendants argue that the impact of actuary Gucciardi's September 2006 resignation, the lawsuit, and the difficulty in finding a replacement actuary on the Plan's ability to submit a request for a determination letter are also questions of fact. (Def.'s Br. at 21.)

It is true that the parties dispute a number of factual issues, including those relating to obtaining an IRS determination letter. Both parties have submitted evidence in support of their respective positions regarding the IRS determination letter, including the existence of an agreement, as well as the defendants' motives in seeking a determination letter. However, the mere existence of factual disputes does not necessarily mean that there is a genuine issue for trial. Rather, the facts in question must be relevant to the issue of whether the decision to defer payment of the plaintiff's benefits was a reasonable interpretation of the Plan. Such being the case, at issue is whether the defendants have established that questions of fact exist as to whether it was reasonable to conclude that it would not be "administratively feasible" to distribute benefits to Ms. Galanis until after the receipt of a determination letter from the IRS. After reviewing both the disputed and undisputed facts of this case, I conclude that, even construing all the facts in the light most favorable to the defendants, no jury could conclude that the decision to deny the plaintiff her benefits was reasonable under the terms of the Plan. Although the defendants have set forth facts indicating that delay of the

20

payments may have been *preferable*, they have not presented any facts indicating that payments of full benefits was not *administratively feasible*.

As an initial matter, it appears to be undisputed that the plaintiff was eligible for her full benefits as of late 2005, and that the Plan had the ability to pay the plaintiff her full benefits at least as of February 17, 2006, when Caro deposited checks to correct underfunding of the Plan. Actuary Gucciardi, as shown from her deposition testimony above, stated that the Plan had sufficient assets and liquidity to pay the full benefit to the plaintiff at the time Caro corrected the underfunding. Moreover, actuary Gucciardi stated that she was unaware of any barriers that would prevent the Plan from being able to pay full benefits to the plaintiff.

In addition, the defendants have not provided any indication that the Plan's impending termination, or the planned request for a favorable determination letter from the IRS, would have any impact on the Plan's ability to pay full benefits. Actuary Gucciardi's testimony indicates that, even if the Plan was not qualified as of February 23, 2006, the Plan could still pay full benefits, and the only impact would be whether Galanis would have to pay taxes on those benefits. Furthermore, there is no indication that an impending termination of the Plan, or even termination proceedings, would impact the Plan's ability to pay full benefits.

Simply stated, the defendants have not presented any arguments or evidence indicating that, as of February 23, 2006, the Plan lacked the funds to pay the plaintiff in full, or that there were any barriers that would have made it impossible to pay those funds. Such being the case, and under a plain reading of the phrase "administratively feasible," it was feasible for the Plan to pay the plaintiff her full benefits within a reasonable time after February 23, 2006.

21

To be sure, the defendants argue that the issue is not whether the Plan *could* pay benefits, but *when* the Plan *should* pay benefits. However, I see no language in the Plan which gives the plan administrator the discretion to decide to delay payments indefinitely when the Plan has the ability to pay full benefits immediately. Indeed, the defendants point to no language in the Plan which would confer this type of authority beyond the phrase "administratively feasible." Although this phrase may confer discretion on the plan administrator in deciding what a reasonable time would be to calculate benefits or arrange the logistics of distribution, it does not confer discretion to make a decision regarding the distribution of benefits based on the potential tax consequences to Plan participants.

Even assuming that the defendants' argument regarding the impact of actuary Gucciardi's September 2006 resignation, the lawsuit, and the difficulty in finding a replacement actuary could potentially have been relevant to the issue of when it was administratively feasible to distribute benefits, the fact remains that all of these events took place after September 2006, approximately a full year after the plaintiff first requested her benefits. Moreover, actuary Gucciardi's deposition testimony indicates that the calculation of the plaintiff's benefits had been completed far in advance of her resignation.

> [Plaintiff's Counsel]: Did you ever make a calculation of benefits payable to Ms. Galanis?
>
> [Actuary]: I did.
>
> [Plaintiff's Counsel]: When did you do that?
>
> [Actuary]: I did a calculation of the termination liability for the Plan as a whole and included Ms. Galanis' calculation. It was done as of December 31st, 2005.
>
> (Gucciardi Dep. at 25.)

As such, the above-listed events in 2006 do not appear to have impacted the point at which it was administratively feasible for the plaintiff to have received her benefits.

The defendants focus much of their argument on the need to obtain a determination letter from the IRS, as well as on the existence of an "agreement" with the Department of Labor to not distribute benefits until after the receipt of this determination letter. Again, however, these arguments do not address whether the Plan had the ability to pay the plaintiff her benefits. It is true that the defendants cite to potential adverse consequences to the Plan and its participants if benefits were distributed prior to receipt of the determination letter. If these adverse consequences were sufficiently severe, it is possible that an argument could be made that a distribution was not "administratively feasible." However, the only adverse consequence specifically cited by the defendants is the potential tax consequences for the recipients of the distribution, which would primarily impact the plaintiff. The potential threat of earlier taxation of benefits does not rise to the level of making a distribution not feasible.

Also of note is the sequence of events relating to the plaintiff's request for benefits, and her subsequent denial due to the desire of the Plan to first obtain a determination letter. Although these events do not prove or disprove the facts relating to obtaining this determination letter, including the existence of an agreement to withhold benefits pending the letter, they do provide an indication as to whether the Plan had the ability to pay the plaintiff prior to the receipt of a letter. These events indicate that it was not necessary to obtain the determination letter prior to distributing benefits.

The plaintiff first requested her benefits in a letter dated September 27, 2005. Caro alleges that he contacted Lisa Stromek at the Department of Labor on or about December 14, 2006, and that he was told Ms. Stromek would be contacting the plaintiff. In a letter from the Department of Labor

23

dated December 20, 2006, Ms. Galanis was informed that Ms. Stromek had confirmed that the paperwork for the plaintiff's benefits was complete, and that distribution was pending the calculation of her benefit. Ms. Stromek contacted the plaintiff and explained to her the appeals procedure and civil penalties available under ERISA. (Caro Aff., Ex. I.) There is nothing in this letter to indicate that Caro discussed with Ms. Stromek his intention to obtain a determination letter prior to distributing benefits. Rather, this letter seems to indicate that the distribution of benefits was dependent on the completion of administrative tasks, namely the calculation of her benefits.

The deposition testimony of Gucciardi further indicates that the calculation of benefits was completed, at the request of the Plan sponsor, by the end of 2005. Gucciardi testified that this information was communicated to the Plan sponsor prior to Gucciardi's resignation in September.

[Plaintiff's Counsel]: Was there any difficulty about its computations? I mean, calculation of benefits.

[Actuary]: No

[Plaintiff's Counsel]: And this was even though the Plan was experiencing a shortfall at that point?

[Actuary]: That's correct.

[Plaintiff's Counsel]: Did you ever make a calculation of benefits payable to Ms. Galanis?

[Actuary]: I did.

[Plaintiff's Counsel]: When did you do that?

[Actuary]: I did a calculation of the termination liability for the Plan as a whole and included Ms. Galanis' calculation. It was done as of December 31st, 2005.

[Plaintiff's Counsel]: And what was the benefit to which she was entitled as of that date?

24

[Actuary]: The accrued benefit was $454.68 . . . Per month . . . Effective at normal retirement age of 59.

[Plaintiff's Counsel]: She had been terminated earlier that year. Did that make a difference about her eligibility for normal retirement?

[Actuary]: No.
. . .
[Plaintiff's Counsel]: In the case of Ms. Galanis, what was the earliest date she could receive the benefit you just described?

[Actuary]: The earliest date would have been her termination of employment.

[Plaintiff's Counsel]: Which would have been in the spring of 2005?

[Actuary]: I believe that was the date.

[Plaintiff's Counsel]: Okay. Now did you calculate the lump sum retirement benefit associated with the number you just gave us?

[Actuary]: Yes, I did . . . $74, 838.

[Plaintiff's Counsel]: And that would be if she took that option payable during 2005?

[Actuary]: Yes. That was calculated as of December 31st, 2005.

[Plaintiff's Counsel]: When, if at all, did you report that information to the Plan sponsor?

[Actuary]: I don't remember.

[Plaintiff's Counsel]: Was it earlier than when you resigned in September of 2006?

[Actuary]: Yes.
. . .
[Plaintiff's Counsel]: Were you asked by the Plan sponsor to calculate the benefit as you've just described?

[Actuary]: Yes.

[Plaintiff's Counsel]: Okay. When did you receive that request?
. . .

25

[Actuary]: My best estimate would be sometime in . . . maybe the third quarter of 2005.

[Plaintiff's Counsel]: Did you generate that year end 2005 calculation during 2005 or during 2006?

[Actuary]: It would have been in late 2005.

. . .

[Plaintiff's Counsel]: And to whom did you give copies of that document, if anybody?

[Actuary]: I -- I believe it was Ron Orlean and Peggy Caro.

[Plaintiff's Counsel]: Why did give a copy to Peggy Caro?

[Actuary]: As the Plan sponsor.

(Gucciardi Dep. at 23-28.)

On February 21, 2006, the plaintiff again requested that she receive her benefits, calculated as of April 29, 2005, by March 1, 2006. A copy of this letter was sent to Ms. Stromek. Although Caro did not directly respond to the plaintiff, he contends that he believed that his conversations around that same time with Ms. Stromek, whom he believed was also in communication with the plaintiff, were sufficient responses to the plaintiff's letter. The defendants claim that Caro's discussions with Ms. Stromek included an IRS inquiry. However, the defendants have not submitted any documentation indicating that Caro spoke with Ms. Stromek about the need for a determination letter. There is also no evidence that Ms. Stromek contacted the plaintiff about the need for a determination letter prior to the plaintiff's receipt of benefits.

On May 5, 2006, the plaintiff, by her attorney, made a formal written request and claim for her benefits. In response, on June 8, 2006, the defendants, through their attorney, stated that the Plan

would distribute vested accrued benefits following the receipt of a determination letter from the IRS. (Caro Aff., Ex. N.) This appears to be the first time the plaintiff was notified that her benefit payments were being delayed pending an IRS determination letter.

On June 15, 2006, the plaintiff, by her attorney, inquired as to why the efforts to obtain a determination letter from the IRS would affect Galanis' claim for benefits. On June 20, 2006, the defendants, through their attorney, responded that Caro was seeking a favorable determination letter from the IRS in order to protect the other participants of the Plan, and that he had notified Ms. Stromek of this planned course of action at the time Ms. Galanis initially contacted the Department of Labor. (Caro Aff., Ex. N.) As noted above, the only evidence regarding Caro's conversation with Ms. Stromek at the time of their initial contact relates to the plaintiff's receiving her benefits once they were calculated.

On July 21, 2006, the plaintiff, by counsel, wrote a letter stating that "this letter constitutes Ms. Galanis' final appeal of the denial of her claim for benefits." (Aff., Ex. XII, Ex. C.) In response, on August 25, 2006, the Plan's attorney denied the plaintiff's appeal, stating that "[w]ith respect to your appeal, Dr. Caro has advised me to communicate to you that the U.S. Department of Labor in Chicago agreed that a favorable IRS ruling was required to protect the Plan participants. Therefore, Dr. Caro, acting on behalf of the Plan sponsor, and the U.S. Department of Labor have made an agreement that this would be the course of action. Per this agreement, the appeal of the claim is denied." (Levy Aff., Ex. XII, Ex. C.) Both parties agree that there was no formal, written agreement that existed with the Department of Labor. Moreover, the plaintiff has submitted phone records from the Department of Labor documenting a phone conversation involving the plaintiff on September 29, 2006, in which a representative from the Department of Labor "verified with Colleague and

27

Supervisor that DOL does not enter into any formal agreements with plans, perhaps save for during an investigation, and the agreement would certainly be in writing." (Angell Decl., Ex. B-6.)

On September 11, 2006, the plaintiff requested information about the Plan's statement that it was seeking a determination letter from the IRS and was in the process of a plan termination. (Levy Aff., Ex. XVIIIA.) The defendants eventually responded to the plaintiff's attorney on September 28, 2006, and notified the plaintiff of the resignation of Gucciardi, and stated that "[a]t this time, no payments can be made to Ms. Galanis. All actuarial studies will have to be re calculated by the new actuary before any participants can be paid." (Levy Aff., Ex. XIXB.) However, the defendants did not provide information indicating that the Plan was in the process of seeking a determination letter from the IRS or had started plan termination. It is undisputed that the Plan has still not filed any request for plan termination. Moreover, the Plan did not file a request for a determination letter with the IRS until May 9, 2007. The defendants attribute this delay to the resignation of actuary Gucciardi, the lawsuit, and the resulting difficulty in obtaining a new actuary. The defendants further contend that actuary Gucciardi did not file for an IRS determination letter prior to her resignation letter by the time she quit in September 2006 because the February 2006 request for her to apply to the IRS crossed in the mail with the actuary's February 2006 resignation.[7]

An event of particular note in this sequence of events is Caro's taking a distribution of $71,662.42 in 2006. (Caro Aff., ¶ 41.) The defendants attempt to justify this distribution, notwithstanding the need for an IRS determination letter, by arguing that this distribution was only one-third or less of Caro's total benefits, and that he would waive any claim against the Plan

_____

[7]To reiterate, the defendants contend that actuary Gucciardi resigned three times before permanently resigning in September 2006.

28

regarding the distribution. This distribution, according to the defendants, was in contrast to the plaintiff's request for distribution, which would have required immediate payment of her total benefits. Moreover, the plaintiff would not have waived any claims against the Plan. (Def.'s Br. at 15.)

The defendants' arguments claiming a distinction between the plaintiff's and Caro's situations are unavailing. Rather, Caro's receipt of a distribution approximately equal to the distribution claimed by the plaintiff indicates that paying the plaintiff her full benefits in 2006 was almost certainly "administratively feasible." Given that the amount of funds involved was essentially identical, it is immaterial whether the benefits asked for constituted the whole or part of the total benefits. The alleged need for a determination letter did not hinder the Plan's ability to make a distribution to Caro in 2006, and there is no indication as to why the situation should have been different for the plaintiff.

Given this sequence of events, most notably Caro's taking a distribution despite the claimed need for a determination letter, there is no indication that the Plan did not have the ability to pay the plaintiff her full benefits in 2006. Although there may have been an understanding between the Plan and the Department of Labor that the Plan would withhold benefits until the receipt of a determination letter, there is no evidence of a binding agreement such that the Plan could not have made a distribution. Indeed, Caro's taking of a distribution underscores this point. Moreover, the delay in filing a request for a determination letter calls into question the necessity of obtaining this letter prior to distributing benefits. As noted above, the Plan did not file a determination letter request until May 9, 2007.

In sum, the defendants have failed to present sufficient evidence demonstrating it was not administratively feasible for the Plan to pay the plaintiff her full benefits in 2006. Rather, the evidence indicates that the Plan had sufficient funds to pay the plaintiff, that the plaintiff's benefits had been calculated as of the end of 2005, and that the alleged hindrances to making her payment, including the need to obtain a determination letter, did not preclude the Plan from making distributions of this calculated benefit. This is particularly evidenced by Caro's taking a distribution in 2006 that was approximately equal to the plaintiff's claimed benefit. Given that the plaintiff is entitled to her lump sum of benefits calculated as of April 29, 2005, the plaintiff's motion for summary judgment as to Count I of her complaint will be granted.

The plaintiff also argues that she is entitled to interest attributable to the delay in payment of her benefit. However, ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), permits "a participant or beneficiary . . . to recover benefits due to him under the terms of his plan." As noted by the Seventh Circuit, the "argument that benefits include interest on benefits when the benefits are paid late is inconsistent with the principle that benefits payable under an ERISA plan are limited to the benefits specified in the plan." *Clair v. Harris Trust & Sav. Bank*, 190 F.3d 495, 497 (7th Cir. 1999). Given that there is no provision for interest under the Plan in this case, interest is not recoverable in a suit to recover benefits under the Plan. *See Id.* ("[I]nterest is not a benefit specified anywhere in the plan, and only benefits specified in the plan can be recovered in a suit under section 502(a)(1)(B).")

It is true that the court in *Clair* indicated that interest may be recoverable in a suit under § 502(a)(3)(B), which authorizes suits to redress violations of a plan, rather than to recover unpaid benefits under a plan. However, the plaintiff's amended complaint does not refer to this section, and

30

it is thus inapplicable. As such, the plaintiff is not entitled to interest due to a delay in benefit payments.

**B. Failure to Provide Information**

The plaintiff also argues that Caro, as Plan fiduciary and administrator, failed to provide ERISA-mandated information within the statutory time limits. Under the ERISA statute, the regulations, and the Plan document, an initial claim for benefits must be adjudicated within 90 days. If there is an adverse benefit determination, "the plan administrator shall provide a claimant with written or electronic notification of any adverse benefit determination," with the notification setting forth:

(i)     The specific reason . . . for the adverse determination;

(ii)    Reference to the specific plan provisions on which the determination is based;

(iii)   A description of any additional material or information necessary for claimant to perfect the claim and an explanation of why . . . [it] is necessary;

(iv)    A description of . . . review procedures and . . . time limits . . . .

29 C.F.R. § 2560.503-1(g); *see also* 29 U.S.C. § 1133.[8]

---

[8]29 U.S.C. § 1133 provides that:

In accordance with regulations of the Secretary, every employee benefit plan shall–

 (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and

 (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

31

The plaintiff contends that the Plan administrator failed to respond to her request for a retirement benefit in her letter on September 27, 2005. According to the plaintiff, a response was due ninety days after this request, i.e. on December 26, 2005, and that as September 4, 2007 (the dispositive motion deadline), 617 days had passed since this deadline. The plaintiff also points to a February 21, 2006 reiteration of her request for benefits, and claims that the defendant failed to provide an adequate response to this request. Furthermore, the plaintiff cites letters on May 5, 2006, June 21, 2006, September 11, 2006, and September 28, 2006, and contends that the defendant failed to adequately respond to these letters, or responded with misrepresentations. (Pl.'s Br. at 17.) The plaintiff contends that these failures to provide information warrant a penalty pursuant to 29 U.S.C. § 1132(c).

Title 29 U.S.C. § 1132 provides for the possibility of civil penalties for a plan administrator due to a failure to comply with a request for information. Under § 1132(c),

> Any administrator . . . who fails or refuses to comply with a request for any information which such administrator is required . . . to furnish to a participant or beneficiary (unless such failure or refusal results from matters reasonably beyond the control of the administrator) . . . the material requested . . . within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $ 100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper.

However, a plan administrator's failure to comply with the requirements of 29 U.S.C. § 1133, which outlines the requirements for a plan rather than a plan administrator, does not generally give rise to civil liability for a plan administrator under § 1132(c). The Seventh Circuit has held that § 1132(c), except in the specific situation described below (namely, when there is a request for an explanation for the denial of a claim for benefits), cannot be used to impose civil liability for a plan administrator's failure to provide the information and documents required under § 1133. *Wilczynski*

32

*v. Lumbermens Mut. Cas. Co.*, 93 F.3d 397, 406 (7th Cir. 1996). In *Wilczynski*, the claimant sought civil penalties under § 1132(c) to redress the plan administrator's delay in providing the claimant with materials in its possession pertinent to the claimant's appeal of her denial of benefits. *Id*. The court held that, "[b]ecause section 1132(c) authorizes the imposition of sanctions only for the failures or refusals of the 'plan administrator,' and not those of the 'plan,' . . . section 1132(c) cannot be used to impose civil liability for the violation of section 1133 alleged by [the claimant]." *Id*.

As noted above, there is an exception to the general rule that § 1132(c) cannot be used to impose civil liability on a plan administrator for violations of § 1133. Specifically, civil liability for a plan administrator may exist under § 1132 if the plan administrator fails to comply with a plaintiff's request for an explanation for denying a claim for benefits, as required under § 1133. As noted by the Seventh Circuit, "[w]hen a claim is denied, § 1133 requires that the administrator provide the participant with an explanation and his reasoning for denying the claim. At this time a request for an explanation can be made and the failure of the administrator to comply with that request would give rise to liability under § 1132(c)." *Kleinhans v. Lisle Sav. Profit Sharing Trust*, 810 F.2d 618, 624 (7th Cir. 1987). However, "no § 1132 liability exists absent a plaintiff's request for the explanation he was entitled to under § 1133, *and* the failure of the defendants to provide that explanation within thirty days of the plaintiff's request." *Id*. (emphasis in original).

Although a violation of § 1133 can lead to civil penalties for plan administrators under § 1132 in certain circumstances, a violation of 29 C.F.R. § 2560.503-1(g) cannot lead to sanctions under § 1132. The Seventh Circuit has held that "the sanctions imposed by [§ 1132(c)] may not be imposed for the violation of an agency regulation." *Wilczynski*, 93 F.3d at 406; *see also Groves v. Modified Retirement Plan*, 803 F.2d 109, 116 (3d Cir. 1986); *Stuhlreyer v. ARMCO, Inc.*, 12 F.3d 75, 79 (6th

33

Cir. 1993); *Goepfort v. Trustmark Ins. Co.*, 2006 U.S. Dist. LEXIS 64779, *7 (E.D. Wis. 2006) ("a court may not impose § 1132(c) sanctions for the violation of a regulation.").

Given the above, in order to determine whether the potential for civil liability exists for a plan administrator under § 1132 for a failure to comply with the requirements of § 1133, the court must determine (1) whether the letters cited to by the plaintiff constituted requests for explanations such that § 1132 liability potentially exists, and (2) if the letters were requests for explanations, whether the plaintiff received timely responses to such requests. After reviewing each letter, I conclude that (1) the letters from September 27, 2005 and February 21, 2006 were simply requests for benefits rather than requests for explanations, such that no § 1132 liability exists; (2) although the letters from May 5, 2006 and July 21, 2006 could arguably be viewed as requests for explanations, it appears the plaintiff received timely responses thereto; and (3) the letters from September 11, 2006 and September 25, 2006 were not requests for explanations, but were rather requests for information and documents regarding the alleged plan termination, such that no § 1132 liability exists.

To begin with, the letters of September 27, 2005 and February 21, 2006 "cannot be construed as anything other than demands for payment; no request for an explanation as to the defendants' conduct can be implied from the letters" *Kleinhans*, 810 F.2d at 624. Specifically, in the letter of September 27, 2005, the plaintiff requests that the defendant "[p]lease look into this matter and send me my vested benefits by October 21, 2005." (Levy Aff., Ex. XVI, Response 10.) There is nothing in the letter indicating that the plaintiff's letter was a request for an explanation, rather than simply being a request for retirement benefits. Similarly, the plaintiff's letter of February 21, 2006 is also a request for her retirement benefits, rather than a request for an explanation. In this letter, the plaintiff stated that "I will hold you as the administrator of the Defined Benefit Plan liable for

34

distribution earned and effective as of April 29, 2005 and expect to receive payment by March 1, 2006. Documents for the transfer of funds should have already been prepared and sent to me." (Levy Aff., Ex. XVI, Response 10.) Again, there is no indication that the plaintiff is requesting an explanation for the denial of her benefits. Rather, the plaintiff's letter "is nothing more than a statement of the defendants' position and a statement regarding [her] intention to institute legal action." *Kleinhans*, 810 F.2d at 624.

The plaintiff's May 5, 2006 letter did state that she was requesting "a full and fair response" to her request for benefits. However, the plaintiff received a response to this request. Specifically, the Plan, through its attorney, sent a letter on June 8, 2006 stating that "The Plan Sponsor has advised us that it anticipates seeking a new determination letter from the IRS in line with the guidelines under IRS Revenue Procedure 2005-66. Following the receipt of the determination letter, the Plan will then distribute the vested accrued benefits to former Plan participants, including Ms. Galanis." (Levy Aff., Ex. XII, Ex. C.)

Similarly, the plaintiff's July 21, 2006 letter stated that "[t]his letter constitutes Ms. Galanis' final appeal," reiterated her request for the "prompt and complete distribution of her vested Accrued Benefit," and also requested "that the Plan Administrator provide the specific Plan provision, ERISA or Code section, supporting regulation or other authority upon which the decision to the instant requested determination on review rests, if adverse to Ms. Galanis." In addition, the letter asks "how does the Plan Sponsor's effort to secure an IRS determination letter provide a proper basis for the Plan Administrator to delay, defer or deny its independent fiduciary dut(ies)?" (Levy Aff., Ex. XII, Ex. C.) Again, the plaintiff received a response to these requests. On August 25, 2006, the Plan, through its attorney, sent a letter stating that "the U.S. Department of Labor in Chicago agreed that

a favorable IRS ruling was required to protect the Plan participants. Therefore, Dr. Caro, acting on behalf of the Plan sponsor, and the U.S. Department of Labor have made an agreement that this would be the course of action. Per this agreement, the appeal of the claim is denied." (Levy Aff., Ex. XII, Ex. C.)

Although these letters could be construed as requests for explanations for the denial of the plaintiff's claim, the plaintiff received responses to her requests. To be sure, the responses did not contain a great deal of specificity in explaining how the need for a favorable IRS ruling provided the basis for the denial of benefits. However, while the "[t]he administrator must give the 'specific reasons' for the denial, 29 U.S.C. § 1133(1); 29 C.F.R. § 2560.503-1(f)(1); *Donato v. Metropolitan Life Ins. Co.*, 19 F.3d 375, 382 (7th Cir. 1994) . . . that is not the same thing as the reasoning behind the reasons." *Gallo v. Amoco Corp.*, 102 F.3d 918, 922 (7th Cir. 1996). "All [the administrator] has to do is give the applicant the reason for the denial of benefits; he does not have to explain to him why it is a good reason." *Id.* Here, the need to secure a favorable IRS ruling was the stated reason for denying the immediate payment of benefits to the plaintiff. The plan administrator was not required to elaborate as to why this reason was valid.

The final two letters at issue were sent by plaintiff's counsel on September 11, 2006 and September 25, 2006. The letter of September 11, 2006, requested that the Plan either provide a copy of the notice of plan termination or have its administrator confirm in writing that no termination proceedings have been initiated. Moreover, the letter requested that the Plan, "[i]n the event a termination proceeding in underway, please provide copies of all documentation indicating when it began, what its status is, what is being done to protect the interests of the participants, and what impact, if any, it will have on Ms. Galanis and her accrued, vested benefits." (Levy Aff., Ex.

36

XVIIIA.) The letter of September 25, 2006, reiterated these requests. A letter from Caro, dated September 19, 2006 responded to the September 11, 2006 letter, and stated that "if [plaintiff] has not forwarded all correspondence between both counsels to you, please contact us at your convenience and we will provide you with the information/documents you need." (Levy Aff., Ex. XVIIIB.) Caro's letter of September 28, 2006, in response to the September 25, 2006 letter from the plaintiff, notified the plaintiff of the resignation of Joan Gucciardi, and stated that "[a]t this time, no payments can be made to Mrs. Galanis. All actuarial studies will have to be recalculated by the new actuary before any participants can be paid." (Levy Aff., Ex. XIXB.)

Given the nature of the responses to the plaintiff's requests for information in her letters from September 11 and September 25, it is unclear whether the plaintiff actually received an adequate response to these requests. However, even assuming that the plan administrator provided an inadequate response to these two letters, this does not give rise to civil liability under § 1132(c). This is because, as noted above, except when there is a request for an explanation for the denial of a claim for benefits, a plan administrator's failure to provide the information and documents required under § 1133 does not lead to civil penalties under § 1132. *See Wilczynski*, 93 F.3d at 406. Here, similar to the situation in *Wilczynski*, the plan administrator arguably failed to provide documentation regarding the Plan's termination, which the Plan may have been required to provide under § 1133. However, § 1132 does not provide for civil liability for a plan administrator who fails to provide such information.[9]

_____

[9]Although 29 C.F.R. § 2560.503-1(g) does specifically refer to the duties of a plan administrator, as noted above, the court in *Wilczynski* held that "the sanctions imposed by [29 U.S.C. § 1132(c)] may not be imposed for the violation of an agency regulation." 93 F.3d at 406; *see Groves*, 803 F.2d at 116.

To be sure, the court in *Wilczynski* did acknowledge that, as held in *Kleinhans*, "a plan administrator's failure to respond to a claimant's request for an explanation of a plan's denial of benefits may give rise to liability under section 1132(c)." 93 F.3d at 406. However, the letters from September 11, 2006 and September 25, 2006 were not requests for explanations, but were rather requests for information and documents regarding the alleged plan termination. As noted above, the plaintiff received the explanation for her denial from the plan administrator in the letter dated August 25, 2006. The plan administrator was not required to elaborate as to why this reason was valid.

In sum, the letters cited to by the plaintiff amount to either demands for payment of her benefit, requests for explanations to which the defendant responded, or requests for information for which there is no civil liability under § 1132(c). Such being the case, Galanis is not entitled to the civil penalties of § 1132(c), as they do not apply to Galanis' claims against the plan administrator.

## C. Breach of Fiduciary Duty

The plaintiff further seeks relief arising from Caro's alleged breach of fiduciary duty, pursuant to ERISA section 404(a)(1)(A), (B), 29 U.S.C. § 1104(a)(1)(A), (B). Specifically, the plaintiff alleges that Caro breached his fiduciary duty by consistently failing to adequately fund the Plan, delaying the payment of benefits to maximize his own benefit, using Plan assets for his own interests, and making misrepresentations to participants, government agencies, and the Plan's actuary.

The first issue to address, and which the parties dispute, is whether Caro is a fiduciary of the Plan. The plaintiff contends that Caro is a fiduciary of the Plan because he has taken responsibility for the administration of the Plan, including making and implementing decisions for funding, asset management, benefit administrations, and compliance with legal requirements. Moreover, according

38

to the plaintiff, Caro signed government filings and other correspondence as the Plan's fiduciary, and held himself out to others as the Plan's administrator and fiduciary.

In contrast, the defendants argue that Caro's only fiduciary position is as trustee of the trust holding the Plan's assets, and that he only acted on behalf of the employer Practice as to all other functions. The defendants contend that Caro is not liable for the alleged wrongdoings of the Practice just because he is the Practice's officer, manager, and sole shareholder.

Under ERISA, "fiduciary" is defined as follows:

> a person is a fiduciary with respect to a plan to the extent (i) he exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) he renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan, or has any authority or responsibility to do so, or (iii) he has any discretionary authority or discretionary responsibility in the administration of such plan.

29 U.S.C. § 1002(21).

The Seventh Circuit has held that "[a]n individual is a fiduciary to the extent that he exercises *any* discretionary authority or control respecting management of a plan or the disposition of its assets." *Mutual Life Ins. Co. v. Yampol*, 840 F.2d 421, 425 (7th Cir. 1988) (citing *Leigh v. Engle*, 727 F.2d 113, 133-34 (7th Cir. 1984). Moreover, "[t]his liberal standard for fiduciary status has been reiterated in several of our subsequent decisions." *Baker v. Kingsley*, 387 F.3d 649, 664-65 (7th Cir. 2004); *see also Mutual Life,* 840 F.2d at 425 (noting the court's "consistently broad reading" of the statutory definition of "fiduciary."); *Plumb v. Fluid Pump Serv.*, 124 F.3d 849, 855 (7th Cir. 1997). Whether the Plan formally allocates duties to an individual is also not dispositive as to whether that individual is, in fact, a fiduciary. *Plumb*, 124 F.3d at 855 ("[i]t is true that a person

39

can become a fiduciary with respect to a particular activity even if there is no formal written allocation of the duty.").

In this case, it appears that Caro exercised almost complete authority over the Plan, and made the major decisions regarding the management of the Plan, including the distribution of the Plan's assets. Caro communicated directly with Plan participants and with government agencies, and oversaw the Plan's funding, including making personal contributions to cover underfunding. There is no evidence that any other individual possessed decision-making authority over the management of the Plan. Such being the case, Caro had discretionary authority regarding management of the Plan and the disposition of the Plan's assets, and falls within the statutory definition of fiduciary, as well as the liberal standard for fiduciary status reiterated by the Seventh Circuit.

Moreover, although a plan need not formally allocate duties to an individual in order for that individual to be considered a fiduciary, the Plan Document does make note that "any other person to whom any fiduciary responsibility with respect to the Plan . . . is allocated . . . shall discharge his . . . duties and responsibilities in . . . accordance with the standards set forth in Section 401(a)(1) of ERISA." (Levy Aff., Ex. I, Art. XVI). As such, although the Plan documents state that the employer is the Plan's named fiduciary, these documents also contemplate the existence of individuals who owe fiduciary responsibilities to the Plan.

Given that Caro was a fiduciary, the next issue to address is whether he breached any of his fiduciary duties. ERISA outlines the standard of care required of a fiduciary:

(a) Prudent man standard of care.

40

(1) Subject to sections 403(c) and (d), 4042, and 4044 [29 USCS §§ 1103(c), (d), 1342, 1344], a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and–

    (A) for the exclusive purpose of:

        (i) providing benefits to participants and their beneficiaries; and
        (ii) defraying reasonable expenses of administering the plan;

    (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims;

29 U.S.C. § 1104.

ERISA also outlines the liability of a fiduciary who breaches this standard of care:

(a) Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this title shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

29 U.S.C. § 1109(a).

**Insufficient Plan Funding**

The plaintiff alleges that Caro, despite warnings from the Plan's actuary and deficiency penalties from the IRS, failed to take the necessary actions to fund the Plan so that it would have sufficient assets to assure full payments of benefits. The plaintiff contends that by the end of the plan year 2005, the assets were only half of the benefit obligation. According to the plaintiff, Caro breached his fiduciary duty because the Practice had an obligation to fund the Plan, and the Plan's fiduciary has an obligation to assure the Practice fulfilled its obligation. The plaintiff points to the

41

Summary Plan Description which states that the Practice "is required" to fund the benefit program. (Pl.'s Br. at 20.)

In response, the defendants argue that the Plan's assets have always been sufficient to pay the plaintiff's benefits. To the extent that there was underfunding, according to the defendants, these deficits were minor and eventually corrected through Caro's personal payments to the Fund. Moreover, the defendants contend that underfunding is the employer's responsibility and not the responsibility of the employer's shareholder, and that even a fiduciary is not required to fund a plan under ERISA. (Def.'s Br. at 32.)

Given Caro's role in managing the Plan, including overseeing the Plan's funding, Caro had a duty to assure that the Plan had sufficient funds to meet its obligations. Although a sole shareholder may not always have the duty to ensure sufficient funds, Caro specifically took on this responsibility. Indeed, as noted above, Caro personally paid $144,000 into the Plan to correct previous underfunding.

However, although Caro had a fiduciary duty to ensure the Plan was properly funded, I cannot say that there are no issues of material fact as to whether Caro breached his duty. There are issues of material fact both as to whether the Plan was in fact not properly funded, and whether Caro took proper steps to correct its underfunding.

In regard to the Plan's alleged underfunding, it is noteworthy that part of the plaintiff's argument that she is entitled to immediate payment of her benefits is based on the fact the Plan has had, since at least February 2006, sufficient funds to pay her benefits in full. To be sure, the plaintiff has provided evidence that the Plan has suffered from underfunding at times. However, the plaintiff has not provided conclusive evidence that this underfunding was not eventually corrected, or that a

42

lack of funds would affect her ability to receive her full benefits. Although the plaintiff contends that the defendant denied her request for benefits because of Caro's failure to fully fund the Plan, whether this was actually the case presents a question of fact which cannot be resolved at this stage of the proceedings. The defendants, as well as the plaintiff, have presented evidence that the Plan had sufficient funds to pay Ms. Galanis in full. Whether the decision to decline to pay her benefits at the time she requested them was based on the Plan's lack of funds or another reason, such as the desire to obtain a determination letter, also presents a question of fact.

Caro has also presented evidence that he took steps to insure the Plan's proper funding and to insure that the Plan's participants received their full benefits. This includes his $144,000 personal deposit into the Plan's funds, as well as his agreement to waive his own benefits to the extent needed to pay Plan participants upon the Plan's termination.

**Manipulation of Plan Assets**

The plaintiff also contends that Caro breached his fiduciary duty by attempting to maximize his own benefits in the Plan at the expense of the Plan participants. Specifically, the plaintiff argues that Caro maintained a funding deficiency while at the same time taking fund assets as loans for his own use. According to the plaintiff, Caro first took an improper $70,000 loan (which he subsequently returned to the Plan),[10] and later took a $49,727.40 loan after the commencement of this suit. The plaintiff contends that these loans, in combination with Caro's intention to terminate the Plan and pro rate all benefit payments, demonstrate that he was attempting to maximize his own benefits by manipulating Plan assets. Moreover, the plaintiff contends that the alleged need to obtain

---

[10]The court assumes that this "loan" is the same transaction which the defendants characterize as a "distribution."

43

a determination letter was simply a way to stall and avoid paying the benefits requested by the plaintiff. By not paying the plaintiff her benefits, the plaintiff argues, Caro would be entitled to a greater share after a pro rata allocation of benefits upon Plan termination.

In response, Caro argues that a pro rata allocation was only one of the options considered, but that no method was chosen as of September 2006. Moreover, Caro contends that the defendants have confirmed that pro rata allocation is not going to occur upon the Plan's termination, and that Caro would instead waive his benefits to the extent needed to pay benefits in full to other participants.

Whether Caro breached his fiduciary duty by manipulating the Plan's assets is a question which cannot be answered at this stage of the proceedings, as there exists genuine issues of material fact surrounding such determination. Of particular importance is the method of distribution upon termination, and whether there would be a pro rata reduction in the participants' benefits. If there is no pro rata reduction of benefits, and Caro instead waives his benefits in order to fully pay the other recipients, it would be difficult to conclude that Caro had breached his fiduciary duty through manipulation of assets. Although the plaintiff has presented evidence that this pro rata option was considered as an alternative, she has not presented sufficient evidence to demonstrate that a pro rata allocation will, in fact, be implemented by the Plan.

It is true that the plaintiff points to deposition testimony by actuary Gucciardi, in which she states that "[t]he third alternative, and this was the alternative that Ron Orlean, the CPA, and Dr. Caro wanted to pursue, would be to provide a pro rata allocation of assets. In other words have every participant share in the insufficiency." (Gucciardi Dep. at 35.) Moreover, the plaintiff cites actuary Gucciardi's deposition testimony in which she states that Attorney Larry Davidson did not "rule out" the possibility of a pro rata allocation. (Gucciardi Dep. at 77.)

44

However, this testimony does not establish that pro rata allocation is the method that will, in fact, be implemented upon the Plan's termination, or that this alternative was ever chosen as the intended method of allocation. If the Plan does not implement a pro rata method of allocation, it is unclear what effect, if any, Caro's taking of a distribution or loans would have on the ability of the Plan participants to receive their full benefits. As noted above, Caro has stated that he intends to waive his benefits to the extent needed to pay full benefits to other participants. There is no clear indication that the Plan would lack sufficient funds to pay the plaintiff in full if Caro does, indeed, waive his benefits. Moreover, if Caro does waive his benefits, it is unclear how he would have benefitted financially from his taking of loans. Simply stated, there remain issues of material fact as to whether Plan participants will be adversely affected by Caro's actions, and whether Caro would have personally benefitted from these actions.

**Misrepresentation to Plan Participants**

The plaintiff also contends that Caro misled Plan participants in order to preserve assets so that he could maximize his benefits. Specifically, the plaintiff argues that Caro misled the plaintiff by telling her that he was terminating the Plan, and had an agreement with DOL that benefits were not to be distributed until after an IRS determination letter was received in order to protect Plan participants from adverse tax consequences. Moreover, the plaintiff argues that Caro told the Plan's actuary of deposits that were never made, and "played games" regarding not "disseminating" signed documents. (Pl.'s Br. at 24.)

In response, Caro contends that he did not make any misrepresentations. Caro argues that a decision was made to terminate the Plan in 2006 but that complications, including the resignation of the actuary, prevented implementation of the termination. Moreover, Caro insists that he does

45

have an oral agreement with the Department of Labor, and that he did deposit checks to fund the Plan. Lastly, Caro argues that the difficulty in determining whether documents were disseminated to the plaintiff is due to flooding in November 2006 of Caro's home. (Def.'s Br. at 39.)

If Caro did indeed deliberately mislead Plan participants in order to maximize his or his employer's financial status, he may have breached his duty of loyalty. "To participate knowingly and significantly in deceiving a plan's beneficiaries in order to save the employer money at the beneficiaries' expense is not to act "solely in the interest of the participants and beneficiaries."" *Varity Corp. v. Howe*, 516 U.S. 489, 506 (1996). "[L]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA, 29 U.S.C. 1104(a)(1)." *Id.* (quoting *Peoria Union Stock Yards Co. v. Penn Mut. Life Ins. Co.*, 698 F.2d 320, 326 (7th Cir. 1983)).

However, issues of fact again remain as to whether Caro made misrepresentations to the plaintiff, and whether these alleged misrepresentations impacted the plaintiff's ability to receive her full benefits. As noted above, the defendants have presented evidence that the Plan participants will be able to receive their full benefits if Caro waives his right to benefits. Moreover, the defendants have presented evidence that, at the very least, Caro believed he had an agreement with the DOJ, and that he did deposit checks to fund the Plan.

## V. CONCLUSION

In conclusion, and for all of the foregoing reasons, the plaintiff's motion for summary judgment on the ERISA denial of benefits claim will be granted. However, the plaintiff's motion for summary judgment on the claims for failure to provide information and breach of fiduciary duty will be denied.

46

**NOW THEREFORE IT IS ORDERED** that the plaintiff's motion for summary judgment be and hereby is **GRANTED IN PART AND DENIED IN PART**;

**IT IS FURTHER ORDERED** that a scheduling conference be conducted on Tuesday, January 22, 2008, at 9:30 a.m. in Room 253 of the U.S. Courthouse, 517 E. Wisconsin Avenue, Milwaukee, WI 53202. At that time the court will discuss with the parties the further processing of this case to final resolution.

**SO ORDERED** this 7th day of January 2008, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge